## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————————

**U.S. SECURITIES AND EXCHANGE COMMISSION,**     **:**

                     **:**

                     **:**

           **PLAINTIFF,**                 **:**

                     **:**

           **v.**                         **:**    **CIVIL ACTION**

                     **:**    **NO. 05-CV-01150 (JDB)**

                     **:**

                     **:**

**RICHARD GLEN SPRADLING,**            **:**

                     **:**

           **DEFENDANT.**

—————————————————————————

### THE COMMISSION'S MOTION FOR FINAL JUDGMENT AND ITS
### MEMORANDUM OF POINTS AND AUTHORITIES
### SUPPORTING THAT MOTION

#### Statement of the Case

The Securities and Exchange Commission (Commission) respectfully moves this Court to enter a Final Judgment against the Defendant, Richard Glen Spradling (Defendant), and it has filed with this motion a proposed Final Judgment. The Commission initiated this action on June 9, 2005 by filing its Complaint with this Court. (Docket No. 1). Defendant's attorney agreed to accept a Waiver of Service, which the Commission filed on June 16, 2005. (Docket No. 2). Based on the constructive service date of June 16, 2005, the Clerk calculated that Defendant was required to file an answer or otherwise respond to the Complaint by August 9, 2005. The Defendant has not responded to the Complaint. On August 29, 2005, the Commission applied for an Entry of Default. (Docket No. 3). On September 15, 2005, the Clerk filed an Entry of Default against Defendant. (Docket No. 4). On October 5, 2005, the Court entered a Minute

Order requiring the Commission to apply for a Judgment of Default against Defendant by November 10, 2005.

In accordance with the Court's October 5, 2005, Order and Fed. R. Civ. P. 55(a) and (b) the Commission applies here for that FINAL JUDGMENT of Default, which the accompanying proposed Final Judgment contains. Specifically, the Commission's proposed Final Judgment seeks the following relief:

1. A permanent injunction against Defendant from violating Section 17(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(b)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5];

2. A penny stock bar against Spradling pursuant to Section 603 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. §77t(g) and 15 U.S.C.§78u(d)(6)];

3. An Order that the Defendant disgorge his illicit profits of $1.6 million that he generated from his misconduct, as more fully described in the Complaint, plus prejudgment interest of $173,075.83; and

4. An Order that the Defendant pay a penalty of $120,000 pursuant to Section 20(d)(1) of the Securities Act [15 U.S.C. §77t(d)(1)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

The Commission below explains the basis for the relief it seeks.

## Statement of Facts

### A.    The Commission's Complaint Alleged Serious Violations of the Federal Securities Laws, which Defendant Has Never Denied

The Commission here recites a summary of the relevant allegations of its Complaint against Defendant, which he never denied. Defendant is approximately 46 years old, and he lives in Sugar Land, Texas. For the past several years, he has earned a living as a promoter of

"penny stocks"[1] through at least four companies that he owned.  They are RS Market Alerts, Inc.,

Market News Alert, Fairview Consulting, and Omni Traders.  (Complaint, ¶ 11).

Defendant used his several businesses to create and disseminate multiple newsletters to

promote numerous penny stocks.  From at least April 2001 to September 2003, Defendant

produced newsletters under various titles, including "Market News Alert," "Breaking Market

News," "National Investors News Update," "National Investors Alert," "OTC Stock Watch," and

"The Stock Alert."  Defendant also owned or controlled certain websites, including

"marketnewsalert.com," "marketnewsalertonline.com," "wallstreetnewsalert.com," and

"investmentreport.com."  As the sole author and editor of the content in these newsletters and

websites, he used them to promote penny stocks through February 2004.  (Complaint, ¶ 12).

Each newsletter generally boasted about the success of Defendant's previous

recommendations, recommended buying stock in a new company, and encouraged readers to

take advantage of the investment opportunity.  Each newsletter carried a disclaimer, which often

stated that Spradling or one of his entities might buy or sell shares of the recommended stock at

any time and, in some cases, it stated that Spradling's research and analysis was independent.

(Complaint, ¶ 13).

From about April 2001 through September 2003, Spradling promoted more than 44

penny stock issues by faxing newsletters to hundreds of thousands of individuals.  He also

promoted certain stocks through his websites.  Spradling either received compensation or entered

agreements to receive compensation from all of the companies, or persons associated with the

---

[1]     The securities touted by Spradling are penny stocks because they do not fit within any of the exceptions from the definition of penny stock established by Exchange Act Section 3(a)(51) [15 U.S.C. §78c(a)(51)] and Rule 3a51-1 thereunder [17 CFR 240.3a51-1].  For instance, nearly all of the stocks featured in Spradling's newsletters and on his websites traded under $5 per share. (See Exchange Act Rule 3a51-1(d)(1) [17 CFR 240.3a51-1(d)(1)]).

companies, whose stock Spradling promoted through his newsletters and on his websites. (Complaint, ¶ 14).

In his newsletters and on his websites, Spradling failed to disclose or inadequately disclosed his compensation for many of these promotions.  (Complaint, ¶ 15).  For example, during May 2002, Spradling created and disseminated a newsletter titled "Market News Alert" that promoted ICOA, Inc. ("ICOA").  In the newsletter, Spradling stated that his company, Fairview Consulting, "was paid 1 million free trading shares of ICOA for the production and distribution of this report by a *third party investor*."  (Emphasis added).  This statement was false because, in fact, the Chairman and CEO of ICOA gave Spradling this stock.  Spradling never disclosed the person who gave him these ICOA shares.  (Complaint, ¶ 16).

In May 2002, Spradling also created and disseminated another issue of his newsletter "Market News Alert," which this time promoted THC Communications, Inc. (THCR).  In his disclosure, Spradling stated that his business, Fairview Consulting, "was paid seventy thousand dollars for the production and distribution of this report by THC Communications, Inc."  In fact, Spradling received approximately $400,000 from THCR and certain of its officers.  (Complaint, ¶ 17).

In November 2002, Spradling's website, investmentreport.com, began featuring a promotion of the Finx Group (FXGP).  On August 24, 2003, the FXGP promotion remained on the website.  However, the disclaimer language on the website, where Spradling purported to disclose his compensation, misrepresented the compensation that Spradling received for promoting FXGP.  The website still stated that *THC Communications, Inc*. paid Spradling's "Fairview Consulting, Inc." seventy thousand dollars for the production and distribution of this report.  In fact, as noted above, the website had promoted THCR ten months earlier.  Despite this

out of date and false disclosure regarding THCR, Spradling failed to disclose any information concerning the amount and nature of his compensation for his web-based promotion of FXGP. In fact, a third-party payer/promoter paid Spradling 50,000 shares of FXGP common stock for the web-based promotion. (Complaint, ¶ 18).

On or about March 2003, Spradling created and disseminated a newsletter titled "National Investors News Update" that promoted Affordable Telecommunications, Inc. (ATCT.PK). Spradling there stated that a third party investor of ATCT gave his company, twenty five hundred dollars as compensation for promoting ATCT. Spradling failed to disclose that, in fact, the company paid him 250,000 of its free trading shares for printing and distributing this newsletter. (Complaint, ¶ 19).

Spradling also engaged in a practice known as "scalping," namely recommending the purchase of a stock without disclosing the intent to sell the same stock that is currently being promoted. As early as April 2001 and continuing through September 2003, Spradling engaged in a pattern of selling stocks that he promoted into the demand that his newsletter and website promotions created. (Complaint, ¶ 20).

For the most part, the prices of the stocks that Spradling promoted increased dramatically during and after his promotion. Certain stocks promoted by Spradling saw price increases ranging from 105% to over 2,065% within approximately forty-five days of the start of his promotions. (Complaint, ¶ 21).

Spradling's newsletters contained only general statements concerning his intentions to sell the shares he received as compensation. The newsletters stated, generally, that the "shares [Spradling received] may be sold into the open market at any time" or that Spradling "may buy or sell [subject company] common shares without notice." (Complaint, ¶ 22).

Spradling's use of a general disclaimer was materially misleading because, despite his recommendation to buy the stock, Spradling intended to and did sell the shares he received into the increased "buy" volume that his newsletters and websites created.  At no time did Spradling disclose his unequivocal intention to sell the stock he received.  (Complaint, ¶ 23).  For example, in October 2001, Spradling created and disseminated a newsletter entitled Market News Alert that promoted Emergent Financial Group, Inc. ("EGFG").  The newsletter, dated November 1, 2001, stated, "Market News Alert and its officers and directors may from time to time buy or sell EGFG common shares in the open market without notice."  (Complaint, ¶ 24).

Spradling began faxing the EGFG newsletter on October 18, 2001, and he sent additional faxes periodically until November 28, 2001.  He sent such faxes for approximately 19 of the 40 days between October 18, 2001 and November 28, 2001.  Spradling first received shares of EGFG stock on October 24, 2001, six days after he sent the first faxes, and on that very same day, he began selling those shares at $4.95 per share.  He continued to receive shares through November 28, 2001.  By that date, he received 391,000 shares through eight transfers into his accounts; from these, he sold 279,000 shares at prices ranging from $.73 to $4.95 through December 5, 2001.  Spradling transferred the remaining 112,000 shares out of his accounts from November 6 to November 8, 2001.  Spradling received proceeds of nearly $294,000 from the sale of his EGFG shares, to compensate him for the newsletter promotion.  (Complaint, ¶ 25).

Spradling received compensation in the form of stock for at least 36 of the penny stocks he promoted from approximately April 2001 through September 2003.  Spradling consistently sold the shares of each company whose stock he received as compensation for his newsletter or website promotions.  Of the 36 stocks Spradling received as compensation, he sold shares of at least 32 of those stocks at the same time he was promoting each stock.  In total, Spradling

6

received approximately 21,000,000 shares of stock in the companies that he promoted from approximately April 2001 through September 2003. In all, Spradling sold more than 14 million of these shares and transferred nearly 7 million shares to accounts held by other individuals or entities. Spradling received approximately $1.6 million in net proceeds from the sale of stocks that he promoted. (Complaint, ¶ 26).

On at least one occasion, Spradling fraudulently misrepresented a company's financial performance either knowingly (despite knowledge of correct information through Commission filings and a written company business plan) or recklessly (without verifying information provided by the issuer despite access to Commission filings). In exchange for this promotion, Spradling received compensation of approximately $400,000 from the company and individuals whom Spradling knew were the CEO and CFO of the company. (Complaint, ¶ 27).

In May 2002, Spradling wrote and disseminated a promotion of THC Communications (THCR) in his Market News Alert newsletter. Prior to disseminating the newsletter, Spradling met with the officers of THCR, obtained a copy of THCR's business plan, and accessed THCR's 2001 financial statements filed with the Commission. THCR's 2001 financial statements reflected $739,065 of audited revenues and its business plan projected 2002 revenues of $12 million. (Complaint, ¶ 28).

Spradling's Market News Alert newsletter for May 2002 stated that, for 2001, THCR's audited revenues were $11.1 million. That was fifteen times greater than the actual 2001 audited revenues that THCR reported in its filings with the Commission. Spradling thus either knowingly or recklessly made a material misstatement of THCR's audited 2001 revenues. (Complaint, ¶ 29). The same edition of the Market News Alert newsletter also listed THCR's projected 2002 revenue as $25 million, twice the amount projected in the business plan that the

company gave to Spradling.  Thus, acting either knowingly or recklessly, Spradling materially misstated THCR's projected 2002 revenues.  (Complaint, ¶ 30).

In numerous newsletters under various names, Spradling stated, "Market News Alert is an *independent research* firm with *paid subscribers*."  (Emphasis added).  Spradling placed this or similar qualifying language in his newsletters for the months of April, June, September, October, November, and December, 2001, and December 2002.  This statement was false and misleading for two reasons.   First, the subject company or a related promoter paid for producing and disseminating each of the promotions contained in these newsletters.  Second, Spradling's several newsletters had no paid subscribers.  (Complaint, ¶ 31).

### B.    Defendant Made Approximately $1.6 Million From His Illicit Stock Sales

Commission counsel has analyzed records that were provided by numerous brokerage firms and that describe Defendant's sales of shares of stock in companies that he promoted.  *See* the Declaration of Margaret McGuire, attached.  Ms. McGuire reviewed trading records, which tracked the account activity for stocks that Defendant promoted from April 2001 through September 2003.   During that period, Defendant maintained 22 brokerage accounts at 12 different brokerage firms.  Using detailed monthly account statements for each of these accounts, she calculated the proceeds of Defendant's sales of stock.

For this period, she found that Defendant received approximately 21,000,000 shares of stock in thirty-six (36) companies, which he promoted.  Of those 21,000,000 shares, Defendant sold more than 14,000,000 shares in those companies.  After deducting brokerage fees, these sales generated proceeds of approximately $1,658,806.83 to Defendant.   In recommending a disgorgement amount, she rounded that number down to $1.6 million.  That step reduced any

calculation error that could harm Defendant and it simplified the calculation of prejudgment interest.

She calculated prejudgment interest by multiplying the net requested disgorgement amount of $1.6 million by the appropriate rate of interest, compounded quarterly, from September 30, 2003 to November 10, 2005.  The total prejudgment interest on $1.6 million for this period is $173,075.83.  Ms. McGuire attached a copy of the prejudgment interest calculation to her Declaration.

**C.    Defendant Recently Filed for Protection under the Bankruptcy Code**

On or about October 15, 2005, Defendant filed for protection under Chapter 7 of the federal Bankruptcy Code.  As explained below, this filing does not affect the Commission's claims for injunctive and monetary relief, which it set forth in its proposed FINAL JUDGMENT.

**ARGUMENT**

**I.    ENTRY OF A DEFAULT JUDGMENT IS APPROPRIATE WHEN, AS HERE, A DEFENDANT HAS FAILED TO ANSWER THE COMPLAINT**

**A.    Applicable Legal Standards**

The Court should enter a default judgment against Spradling because he has failed to answer the Complaint or otherwise to appear and defend this action and the Complaint sets forth sufficient factual allegations to support the entry of a judgment.

Rule 55(b)(2) of the Federal Rules of Civil Procedure permits the Court to enter a judgment by default where a properly served defendant has failed to plead or otherwise defend an action and is not an infant or an incompetent person.  Fed. R. Civ. P. 55(b)(2).  "When an application is made to the court under Rule 55(b)(2) for the entry of judgment by default, the district judge is required to exercise sound judicial discretion in determining whether the judgment should be entered."  10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,

Federal Practice and Procedure § 2685 (3d 1998); *see also Jackson v. Beech,* 636 F.2d 831, 835 (D.C. Cir. 1980); *United States v. Schofield,* 197 F.R.D. 6, 8 (D.D.C. 2000).  It is well established that entry of a default judgment is appropriate against a party that is "totally unresponsive."  *See Jackson,* 636 F.2d at 836; *see also H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Lopefe,* 432 F.2d 689, 691 (D.C. Cir. 1970) (per curiam) (stating that "default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party").  The default judgment remedy protects a diligent party from interminable delay and continued uncertainty, and serves as "a deterrent to those parties who choose delay as part of their litigative strategy." *H.F. Livermore Corp.,* 432 F.2d at 691.

> **B.      Counsel to Defendant Accepted a Waiver of Service**

Spradling was properly served with the Summons and Complaint in this action when counsel to Defendant accepted a Waiver of Service, which the Commission filed with the Court on June 16, 2005.  (Docket No. 2).  Thus, the Commission's service of process upon Spradling was indisputably proper here.

> **C.      Entry of a Default Judgment is Appropriate**

As shown, the procedural history of this case fully justifies this Court's exercise of its discretion to enter a final judgment by default against Spradling.  The failure of Spradling to answer or defend this action is willful.  It must be assumed to be part of a litigation strategy of delay.  Approximately five months have passed from the time that Spradling's counsel was duly served with the Complaint.  The Clerk entered Spradling's default nearly two months ago. Despite receiving notice that a default judgment could be entered against him, Spradling did not seek to set aside the default, respond in any way to the Complaint, or seek any enlargement of

the time within which to answer or otherwise respond.  Accordingly, the Court should enter a

final judgment by default against Spradling.

## II.    THE COMPLAINT ESTABLISHES SPRADLING'S LIABILITY

The legal effect of a default is to establish that the violations alleged against Spradling in

the Complaint did indeed occur.  *Montcalm Publ'g Corp. v. Ryan*, 807 F. Supp. 975, 977

(S.D.N.Y. 1992) (stating that "[a] default constitutes admission of liability; therefore, the effect

of a defendant's default is that it is deemed to have admitted all of the well-pleaded allegations

raised in the complaint pertaining to liability"); *see also Comdyne I v. Corbin*, 908 F.2d 1142,

1149 (3d Cir. 1990) (when a court determines that a defendant is in default, the factual

allegations of the complaint are taken as true); *Geddes v. United Fin. Group,* 559 F.2d 557, 560

(9th Cir. 1977) (same); *Trans World Airlines, Inc. v. Hughes,* 449 F.2d 51, 70 (2d Cir. 1971)

(stating that "default had the effect of admitting or establishing that the acts pleaded in the

complaint violated the . . . laws and that those acts caused injury . . . in the respects there

alleged").  As explained below, the allegations set forth in the Commission's Complaint establish

that Spradling violated the antifraud provisions of the Exchange Act (Section 10(b) and Rule

10b-5), and the anti-touting provision of the Securities Act (Section 17(b)).

### A.    Spradling Violated the Antifraud Provisions of the Exchange Act

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder make it unlawful for any

person, directly or indirectly, in connection with the purchase or sale of any security, to make an

untrue statement or omission of material fact; use any device, scheme or artifice to defraud; or

engage in any act, practice, or course of business which operates or would operate as a fraud or

deceit upon any person.  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  These antifraud provisions

are catchalls expressly designed to thwart misrepresentation and manipulation in securities

trading.  *See Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151 (1972); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 859 (2d Cir. 1968) (en banc); *SEC v. Softpoint, Inc.,* 958 F. Supp. 846, 861 (S.D.N.Y. 1997).  They are thus liberally construed to embrace a wide range of misconduct.  *Softpoint,* 958 F. Supp. at 862.

Scienter is a required element under Section 10(b) and Rule 10b-5 of the Exchange Act.  *See Aaron v. SEC,* 446 U.S. 680, 697 (1980).  The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12 (1976).  Knowledge or recklessness is sufficient to satisfy the scienter requirement.  *Graham v. SEC,* 222 F.3d 994, 1004 (D.C. Cir. 2000); *SEC v. Current Fin. Servs., Inc.,* 100 F. Supp. 2d 1, 7 (D.D.C. 2000); *SEC v. Better Life Club of America, Inc.,* 995 F. Supp. 167, 175 (D.D.C. 1998).  "A person acts with the requisite scienter when the conduct 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the defendant must have been aware of it.'"  *Current Fin. Servs.,* 100 F. Supp. 2d at 7 (quoting *SEC v. Steadman,* 967 F.2d 636, 641-2 (D.C. Cir. 1992)).  Proof of scienter need not be direct, but may be "a matter of inference from circumstantial evidence."  *Herman & Maclean v. Huddleston,* 459 U.S. 375, 390 n.30 (1983).  The mental state of a corporation is established through the mental states of its officers.  *See SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1088 n.3 (2d Cir. 1972).

For liability under the antifraud provisions, omissions or misstatements must be material.  The test for materiality is whether there is a substantial likelihood that a reasonable investor would consider the information important to an investment decision, and would view it as having significantly altered the total mix of available information. *See Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988); *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976).  There is a

presumption of materiality for information concerning the financial condition of a company.  *See SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980); *SEC v. Blavin,* 557 F. Supp. 1304, 1313 (E.D.Mich. 1983), *aff'd,* 760 F.2d 706 (6th Cir. 1985).

Courts have interpreted broadly the requirement of Section 10(b) and Rule 10b-5 that violative conduct must occur "in connection with" the purchase or sale of a security. *Superintendent of Ins. of N.Y. v. Bankers Life & Cas, Co.,* 404 U.S. 6, 12 (1971); *In re Ames Dep't Stores Inc. Stock Litig.,* 991 F.2d 953, 964-66 (2d Cir. 1993).  In general, "fraud can be committed by any means of disseminating false information into the market on which a reasonable investor would rely."  *Ames Dep't Stores,* 991 F.2d at 967; *SEC v. Hasho,* 784 F. Supp. 1059, 1106 (S.D.N.Y. 1992).

The Commission's Complaint alleges facts that clearly set forth all of the elements necessary to establish Spradling's violations of the antifraud provisions.  Spradling made at least two material misrepresentations concerning the revenues of THCR in his newsletter promoting THCR stock.  Spradling misrepresented THCR's audited 2001 revenues as fifteen times greater than the audited revenues reported in THCR's filings with the Commission; Spradling misrepresented THCR's projected 2002 revenues as double the amount projected in THCR's business plan.  (Complaint ¶¶ 28-30).  Spradling made these misrepresentations despite having access to and knowledge of the correct revenue information for each year.  Thus, Spradling knowingly or recklessly, i.e. with scienter, misrepresented THCR's revenue.

Spradling also made misrepresentations as to the quality of his newsletters.  Spradling misrepresented his companies as independent research firms, when in fact each promotion was paid for by the subject company or a related promoter.   Spradling also misrepresented that his newsletters had paid subscribers, when in fact, they did not.  (Complaint ¶ 31).

In addition, Spradling scalped the stocks he promoted. (Complaint ¶¶ 20-26). By publishing an investment newsletter, the author implicitly purports to state an honest opinion, based on independent research, that a particular stock is a good investment. However, the fact that he is simultaneously selling large quantities of the stock is strong evidence that he does not, in fact, believe the stock is a good investment. Hence his statements are misleading due to his failure to state the circumstance of his personal trading. *See In re Fidelity/Micron Securities Litigation, 964 F. Supp. 539, 544 (D. Mass. 1997).*

Spradling violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder because the general disclaimers contained in his newsletters deprived readers of information substantially likely to affect their investment decision – that Spradling would go against his own recommendation and immediately sell his shares. *See SEC v. Huttoe*, No. 96-02543, 1998 U.S. Dist. LEXIS 2311, at *27-28 (D.D.C. Sept. 14, 1998) (stating that a newsletter writer's practice of selling shares while recommending, through the newsletter, that others buy has long been understood to operate as a fraud or deceit upon investors).

In addition, Spradling's misrepresentations concerning THCR's revenues alleged in the Complaint were unquestionably material. Spradling misrepresented that information perhaps most important to a reasonable investor, information concerning audited and future revenues of a company promoted as a sound investment. Further, Spradling misrepresented THCR's audited 2001 revenues by fifteen times the actual amount; he misrepresented $739, 065 of audited revenues as $11.1 million of audited revenues in his newsletter. (Complaint ¶¶ 28-29). As the Ninth Circuit Court of Appeals has stated, "[s]urely the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge." *Murphy*, 626 F.2d at 653 (citing cases). Spradling's misrepresentations concerning the independence of and

14

subscription to his newsletters is also material because a reasonable investor would consider the source of information important in the investor's total mix of information. For all of these reasons, the Court should find that Spradling violated the antifraud provisions of the Exchange Act.

**B.    Spradling Violated the Anti-Touting Provision of the Securities Act**

Section 17(b) of the Securities Act requires that paid touters disclose the nature and amount of their compensation. This provision was "particularly designed to meet the evils of the 'tipster sheet,' as well as articles in newspapers or periodicals that purport to give an unbiased opinion but which opinions in reality are bought or paid for." *SEC v. Wall Street Publishing Institute, Inc.*, 851 F.2d 365, 369 n.6 (D.C. Cir. 1988) (citing H.R. Rep. No. 85, 73rd Cong., 1st Sess. 24 (1933)), cert. denied, 489 U.S. 1066 (1989). Failure to disclose compensation information leads investors to believe that the touter is objective and credible rather than beholden to the issuer or a control person of the issuer. *Accord*, *SEC v. Liberty Capital Group, Inc.*, 75 F. Supp. 2d 1160, 1162 (W.D. Wash. 1999) (Securities Act Section 17(b) is violated "when facts show that, in substance, there was a quid pro quo" for providing publicity about a publicly-traded company).

A violation of Section 17(b) occurs when an individual promotes a stock without identifying the nature or amount of funds that paid for the promotion. Scienter is not required to establish a violation of the statute. *SEC v. Wall Street Publishing Inst., Inc.*, 664 F. Supp. 554, 556 (D.D.C. 1986) (finding *per se* violation of Section 17(b) without any discussion of scienter). It is also a violation of Section 17(b) to identify the source of payments without sufficient particularity, with language such as "a third party investor." Section 17(b) requires a promoter to "fully disclose" the compensation received when the touter knows the paying individual is the

issuer or a consultant/promoter directly linked to the issuer.  *See United States v. Amick*, 439 F.2d 351, 364 (7th Cir. 1971) (newsletter publication of information about a company without disclosing payment by the company constitutes a willful violation of Section 17(b)); *Sky Scientific, Inc.*, Initial Decision No. 137 (Mar. 5, 1999), 69 SEC Docket 945 (finding that a newsletter disclaimer, which failed to state the fact that the promoter had received, and would receive, compensation from the promoted company, failed to satisfy the statutory requirement of full disclosure under Section 17(b)), *aff'd*, *In re Lehl*, SEC Rel. No. 33-8102, 77 S.E.C. Docket 1926, 2002 WL 1315552, at *11 (May 17, 2002).

Based on the allegations in the Complaint, Spradling, through his numerous companies and websites, regularly failed to disclose adequately the payments he received for his touts. (Complaint ¶¶ 14-19).  This information is material because it would have alerted a reasonable investor to Spradling's possible bias and to discount Spradling's rosy predictions about the future of the companies he promoted.  Consequently, Spradling violated Section 17(b) of the Securities Act.

III.    **THE COMMISSION IS ENTITLED TO THE RELIEF**
       **SOUGHT IN THE COMPLAINT**

   A.    **This Court Should Permanently Enjoin Defendant from Future**
         **Violations of the Federal Securities Laws**

      1.    **The Reasonable Likelihood of Future Violations Requires**
            **Injunctive Relief**

Section 21(e) of the Exchange Act [15 U.S.C. § 78u(e)] specifically authorizes the

Commission to seek and this Court to issue an injunction prohibiting the Defendant from future

violations of Section 17(b) of the Securities Act and Section 10(b) of the Exchange Act and Rule

10b-5 under that Act.  This Circuit has set forth the standards governing the grant of injunctive

relief for violations of the federal securities laws:

> [T]he district judge should consider <u>whether a defendant's</u>
> <u>violation was isolated or part of a pattern, whether the violation</u>
> <u>was flagrant and deliberate or merely technical in nature, and</u>
> <u>whether defendant's business will present opportunities to violate</u>
> <u>the law in the future.</u>  No single factor is determinative; instead, the
> district court should determine the propensity for future violations
> based on the totality of the circumstances.

*SEC v. First City Fin. Corp.*, 890 F. 2d 1215, 1228 (D.C. Cir. 1989).  (Emphasis added; citations

omitted.)  *See also SEC v. Cavanagh*, 155 F. 3d 129, 135 (2d Cir. 1998).  "[A] single violation

may justify an injunction if committed willfully and knowingly."  *SEC v. First City Fin. Corp.*,

890 F. 2d, at 1230.

         a.    **Defendant's Pattern of Flagrant, Deliberate and**
               **Non-Technical Violations Requires Enjoining**
               **Him from Future Violations**

The Commission's Complaint presented undisputed evidence showing that Defendant

knowingly and willfully deceived investors in his newsletters and websites.  He promoted several

stocks without checking on the facts he asserted, without disclosing how much the management

of those companies paid him for touting stock in their companies, and without disclosing clearly

that he was selling the stocks that he was promoting. This Court's words in a prior decision apply directly here:

> The evidence demonstrates that Defendants' violations of the securities laws were reckless at best, and more likely intentional. Their fraudulent representations to investors were hardly "technical violations."

*SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 15, (D.D.C. 1998).

Defendant's conduct supports an injunction forbidding him from committing future violations of Section 17(b) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5. First, the Complaint alleged that the Defendant violated all of these laws. Second, the Defendant failed to file an answer or otherwise respond to the Commission's complaint. Third, the conduct alleged against Defendant clearly shows fraud and a callous disregard for investors.

Thus, the Commission respectfully requests that the Court issue an injunction that substantially tracks the language of the cited securities laws. The Commission's proposed Final Judgment completely fulfills this requirement.

> **b.    Defendant's Flagrant and Deliberate Conduct Requires that He Be Barred from Participating in Any Offering of Penny Stock**

Section 15(b)(6) of the Exchange Act allows the Commission to seek an additional sanction with respect to any person who was participating "at the time of the alleged misconduct ... in an offering of penny stock," including "any person acting as any promoter … for purposes of … inducing or attempting to induce the purchase or sale of any penny stock." 15 U.S.C. §78o(b)(6). The securities touted by Defendant are penny stocks because they do not fit within any of the exceptions from the definition of penny stock established by Exchange Act Section 3(a)(51) and Rule 3a51-1 thereunder. 15 U.S.C. 78c(a)(51), 17 CFR 240.3a51-1. For instance,

nearly all of the stocks featured in Defendant's newsletters and on his websites traded under $5 per share. (See Rule 3a51-1(d)(1)). Accordingly, his conduct falls within the provisions of Section 15(b)(6).

Both general equitable principles, as well as Section 20(g) of the Securities Act and Section 21(d)(6) of the Exchange Act, as amended by the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), grant courts the authority to impose penny stock bars. Courts have long held that any form of ancillary relief may be granted where necessary and proper to effectuate the purposes of the securities statutes. *See SEC v. United Communications Ltd.*, 899 F. Supp. 9, 12 (D.D.C. 1995). Sarbanes-Oxley codified that authority with respect to penny stock bars. It granted courts the power to impose such relief, "conditionally or unconditionally, and permanently or for such period of time as the court shall determine," against any person inducing or attempting to induce the purchase or sale of any penny stock. A judicial penny stock bar is appropriate against Spradling under that standard because it would deprive him of the opportunity to engage in fraudulent conduct in the future.

### B. The Court Should Order Defendant to Disgorge His Ill-Gotten Gains plus Prejudgment Interest

#### 1. The Court's Equity Power Provides It with Discretion to Order Disgorgement, including Prejudgment Interest

The Court possesses the power to order the defendant to disgorge the ill-gotten gains of his fraudulent activities. *See, e.g., SEC v. First Jersey Secs. Inc.*, 101 F. 3d 1450, 1475 (2d Cir. 1996); *SEC v. Tome*, 833 F. 2d 1086, 1096 (2d Cir. 1987); *SEC v. Hasho*, 784 F. Supp. 1059, 1111 (S.D.N.Y. 1992).

Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the federal securities laws. *SEC v. First City*

*Financial, Ltd.,* 890 F2d, at 1230.    The Commission need establish only "a reasonable approximation of profits causally connected to the violation" to establish the amount of disgorgement that it may claim.    *SEC v. First Jersey Secs., Inc.*, 101 F.3d at 1475 (citation and internal quotes omitted).  "'Any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer[s] whose illegal conduct created that uncertainty.'"    *Id.    See also, SEC v. First City Financial Ltd.,* at 1232.

The Commission took a straightforward approach to calculating the disgorgement amount.    It analyzed the twenty-two (22) accounts, which Defendant used to collect, sell, or transfer stock in companies that he promoted.  From those accounts, it found that Defendant sold more than 14,000,000 of the approximately 21,000,000 shares he received as compensation for promoting companies through his newsletters and websites.  Then, it multiplied the dollar value per share times the total number of shares for a result of $1,658,123.73.  Then to avoid any possible claim of overcharging Defendant, it rounded that number down to $1.6 million as the disgorgement amount.  *See* Statement of Facts, above, at page 7.

### 2.    The Court Should Require Defendant to Pay Prejudgment Interest

Disgorgement rightly includes prejudgment interest to enable the Commission to recover the full amount of the defendant's unjust enrichment and to provide the possibility of complete compensation to the defrauded investors.    Only by imposing prejudgment interest on disgorgement does the wrongdoer give up the interest-free loan on his illicit gains.    The Commission calculates prejudgment interest by using the rate that the Internal Revenue Service establishes for money owed to the United States Treasury.  *E.g., SEC v. First Jersey Secs., Inc.*, 101 F.3d at 1476-77; *SEC v. Drexel Burnham Lambert, Inc.*, 837 F. Supp. 587, 612 n.8 (S.D.N.Y. 1993), *aff'd sub nom*, *SEC v. Posner*, 16 F.3d 520 (2d Cir. 1994).    "Courts have

approved the use of the IRS underpayment rate in connection with disgorgement." *SEC v. First Jersey Securities,* 101 F.3d, at 1476.

The Commission concluded that Defendant generated approximately $1.6 million from selling shares of stock in companies that he promoted. See McGuire Declaration, at ¶ 5. As many courts have previously ruled, the Defendant bears the risk of any imprecision. For example, this Court stated the following:

> As the SEC has established that this figure is a reasonable approximation of unlawful profits, the burden of proof shifts to Defendants to clearly demonstrate that this figure is not a reasonable approximation.

*See First City, 890 F. 2d at 1232; SEC v. Kenton Capital,* 69 F. Supp. 2d, at 15.

To preclude this Defendant from enjoying an interest-free loan on his illicitly obtained gains, the Court should also require him to pay interest on the amount he disgorges. *SEC v. Kenton Capital, 69 F. Supp. 2d, at 16-17.* Thus, the Court should also order the Defendant to pay prejudgment interest of $173,075.83 on his illicit profits of $1.6 million accrued for the period of September 30, 2003 to November 10, 2005. See McGuire Declaration, at ¶ 7. The sum of the disgorgement and prejudgment interest thus total $1,773,075.83.

### C.    The Court Should Impose a Penalty on Defendant

#### 1.    Congress Directed the Commission to Seek Penalties Against Those Who Violate the Federal Securities Laws

Both the Securities Act and the Exchange Act give the Commission the discretion to ask the court to impose statutory penalties against those who violate the federal securities laws. For example, Exchange Act Section 21(d)(3) contains the following language:

> 3) Money Penalties in Civil Actions.—
>
> (A) Authority of commission.— Whenever it shall appear to the Commission that any person has violated any provision of this chapter, the rules or regulations thereunder, or a cease-and-desist order entered by the

Commission pursuant to section 78u–3 of this title, other than by committing a violation subject to a penalty pursuant to section 78u–1 of this title, <u>the Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation.</u>

(B) Amount of penalty.—

(iii) <u>Third tier.—</u> Notwithstanding clauses (i) and (ii), <u>the amount of penalty for each such violation shall not exceed the greater of</u>

(I) <u>[$120,000] for a natural person</u> or $500,000 for any other person, or
(II) <u>the gross amount of pecuniary gain to such defendant as a result of the violation, if—</u>

(aa) <u>the violation described in subparagraph (A) involved fraud, deceit, manipulation,</u> or deliberate or reckless disregard of a regulatory requirement; and

(bb) <u>such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.</u>

Exchange Act Section 21(d)(3), 15 U.S.C. § 78u(d)(3) (Emphasis added.)

The Securities Act contains a parallel provision with nearly identical language.  *See* Securities Act, Section 20(d)(2)(C) [15 U.S.C. § 77t (d)(2)(C)].  Pursuant to the Debt Collection Improvement Act of 1996, the Commission has promulgated rules that increase the amount of a third tier penalty from $100,000 per violation to $120,000 per violation with respect to conduct, such as Defendant's, occurring after February 2, 2001.  17 C.F.R. § 201.1001.

**2.    The Court Should Impose a Penalty of $120,000 on this Defendant**

The Commission recommends that the Court impose a penalty of $120,000 against Defendant.  In reaching this figure, the Commission has taken into account the number of the

Defendant's violations, the extent of his illicit profit, and the approach of prior decisions. Furthermore, it is not seeking the maximum penalty.

Defendant promoted some 44 stocks and profited from many of his promotions as described above. Those promotions involved fraud, deceit, and manipulation. In addition, Defendant's misrepresentations directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons. In short, his conduct meets all of the criteria for finding "Third tier" violations. *See* Section 21(d)(3)(B)(iii) of the Exchange Act and Section 20(d)(2)(C) of the Securities Act, above.

The proposed $120,000 penalty is far less than the penalties that this Court has imposed for similar conduct in previous actions. For example, it imposed a $1.2 million penalty on a defendant for his role in a prime bank scheme, where it also ordered the payment of $1.745 million in disgorgement, plus prejudgment interest. *SEC v. Kenton Capital, Ltd.,* 69 F. Supp., at 17 and 20. Whatever the penalty amount, it is necessary to impose a penalty on this Defendant to punish him and to deter others from violating federal securities laws.

The Commission could seek a much larger penalty if it used an alternative statutory theory based on multiple violations. Such an approach would have led the Commission to seek separate penalties for each of Defendant's many violations. As described, most of Defendant's violations involved fraud, deceit, or manipulation, and substantial loss or the risk of substantial loss to others. Thus, multiplying the penalty amount, $120,000 for Defendant's third tier conduct and $60,000 for Defendant's second tier conduct, by the number of violations would total nearly $3 million.[2]

---

[2]    A "Second tier" penalty is appropriate for violations involving fraud, deceit, or manipulation; such violations do not require that the conduct directly or indirectly, result in or create a significant risk of substantial losses to other persons. 15 U.S.C. 77t(d)(2)(B), 15 U.S.C. 78u(d)(3)(B)(ii).

**D.    Defendant's Recent Bankruptcy Filing Does Not Preclude this Court
from Granting Injunctive and Entering a Monetary Judgment**

Defendant filed for protection under the bankruptcy code on October 15, 2005.
Normally, such a bankruptcy filing would pose a stay prohibiting the entry of a judgment against
a debtor in bankruptcy. That rule does not apply here because the Bankruptcy Code makes a
specific exception for a regulatory agency's responsibility to exercise its enforcement authority.

> [A bankruptcy filing] does not operate as a stay [for] the commencement or
> continuation of an action or proceeding by a governmental unit . . . to enforce
> [its] police or regulatory power including the enforcement of a judgment other
> than a money judgment, obtained in an action or proceeding by the governmental
> unit to enforce [its] police or regulatory power.

11 U.S.C. § 362(b)(4)  *See Collier on Bankruptcy* (15th Ed., Revised), ¶ 362.05[5][b][iii].  *See
also* <u>SEC v. Towers Fin. Corp.,</u> 205 B. R. 27, 30 (S.D.N.Y. 1997) (holding that 11 U.S.C. §
362(b)(4) exempted a Commission action for investment fraud from the automatic bankruptcy
stay and that the Commission could continue to seek disgorgement in furtherance of its police
powers).  *See also Bilzerian v. SEC*, 146 B.R. 871, 873 (Bankr., M.D. Fla. 1992) (finding an
exception to the automatic stay for a Commission action seeking injunctive relief and
disgorgement).  One recent decision neatly summarizes the law, as it applies to Commission
enforcement actions.  The stay provision does not prohibit this Court from here granting
injunctive relief, a penny stock bar, disgorgement, prejudgment interest, or penalties:

> The SEC does not seek only a money judgment.  <u>The amended complaint seeks
> an injunction against [Defendant] from future violations of the securities laws and
> to fix damages in furtherance of the SEC's police powers to deter [Defendant]
> from violating securities laws in the future and to protect the public from fraud.</u>
> When the government seeks to impose financial liability on a party, it is acting in
> its police or regulatory capacity in that it is attempting to curb such behavior by
> making the behavior more expensive.  Until liability is fixed by entry of
> judgment, the government is acting in its police or regulatory capacity by
> "burdening certain conduct so as to deter it."  The SEC action here falls within the
> exception.

24

> The SEC may prosecute an action through and including the entry of judgment on the merits.  The governmental unit exception of 362(b)(4) permits the entry of a money judgment against a debtor.  Anything beyond the *mere entry* of a money judgment against a debtor is prohibited by the automatic stay.  Id. (citations omitted).  Here the SEC seeks an order fixing the appropriate amount of disgorgement, civil penalties, and interest.  The SEC does not seek an order directing payment of disgorgement or civil penalties and interest.  Accordingly, the action may proceed.

*SEC v. Thrasher*, 2002 WL 523279 (S.D.N.Y.) (Emphasis added; citations omitted.)  *See also*

*SEC v. Brennan*, 230 F.3d 65, 72 (2d Cir. 2000).

The relief that the Commission here seeks is key to its enforcement function. Enjoining Defendant from committing future violations of the securities laws, barring him from participating in any offering of penny stock, and issuing orders for disgorgement, prejudgment interest, and penalties indisputably lies within the Commission's police powers to deter Defendant and serves to protect the public from fraud.  Finally, ordering this relief against Defendant will support the Commission's enforcement mission with respect to others who might want to engage in similar schemes involving the illicit promotion of stocks.

## **Conclusion**

Based on the points and authorities stated above, the Commission respectfully requests that the Court enter the Commission's proposed Final Judgment enjoining Defendant from committing future violations of Section 17(b) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5; permanently barring Defendant from participating in any penny stock offering; ordering Defendant to pay disgorgement plus prejudgment interest; and ordering Defendant to pay a penalty.

Respectfully submitted,

U.S. Securities and Exchange Commission,

By: _____/S/_____
James M. McHale, DC Bar No. 111773
Assistant Chief Litigation Counsel,
Enforcement Division,
Margaret S. McGuire, Senior Counsel
100 F Street, N.E., Mail Stop 4631
Washington, DC 20549-4631
Telephone: (202) 551-4476 (McHale)
Fax: (202) 772-4295 (McHale)
mchalejm@sec.gov

Of Counsel:
Paul R. Berger,
Richard W. Grime,
Christine E. Neal,
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549

Dated: November 10, 2005

**<u>Certificate of Service</u>**

I hereby certify that I caused service of the foregoing Commission's Motion and

Memorandum in Support of Final Judgment and Proposed Final Judgment on the

Defendant by sending copy of that pleading to him, to his counsel, and to his Bankruptcy

Counsel by Federal Express messenger service, as follows:


FedEx TRK #  7925-7770-7009

Mr. Richard Glen Spradling
3007 Fairway Drive
Sugar Land, TX 77478
<u>Defendant</u>

FedEx TRK #  7924-3497-3786

Mr. Henry P. Vanderkam
Vanderkam and Associates
1301 Travis Street, Suite 1200
Houston, TX 77002
Phone: (713) 547-8900
Fax: (713) 547-8910
<u>Counsel to Defendant</u>

FedEx TRK #  7917-7966-1049

Bernard E. Brooks, Esq.
4800 Sugar Grove Boulevard, Suite 610
Stafford, TX 77477
Phone: (281) 491-1512
Fax: (281) 240-1829
<u>Bankruptcy Counsel to Defendant</u>

This the 10th day of November 2005


_____/S/_____
James M. McHale